THE HOUSING AUTHORITY OF THE CITY OF UNION CITY, NEW JERSEY, A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT, v. COMMONWEALTH TRUST COMPANY, A BANKING CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.

THE HOUSING AUTHORITY OF THE CITY OF UNION CITY, NEW JERSEY, A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT, v. TRUST COMPANY OF NEW JERSEY, A BANKING CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued October 28, 1957—Decided November 25, 1957.

332

Mr. *Louis Auerbacher, Jr.*, argued the cause for appellant (*Mr. Victor S. Kilkenny,* attorney).

Mr. *Edmund B. Hourigan* argued the cause for respondent Commonwealth Trust Company (*Messrs. Burke, Sheridan & Hourigan,* attorneys).

Mr. *Benjamin Gross* argued the cause for respondent The Trust Company of New Jersey (*Mr. George R. Milstein,* on the brief; *Messrs. Lynch, Lora & Milstein,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J. The Housing Authority of the City of Union City is a public corporation organized by Union City under the authority of the Local Housing Authorities Law, *N. J. S. A.* 55:14A–1 *et seq.,* to supply safe and sanitary housing for persons of low income. In 1950 and 1951 the authority maintained checking accounts in its corporate name with two banks, the Commonwealth Trust Company and The Trust Company of New Jersey. During 1950 the Commonwealth Trust Company charged the authority's account with $1,716, representing the total amount paid by the bank on three checks issued by the authority which were cashed by means of forging the designated payee's endorsement. The Trust Company of New Jersey honored a similar forged check for $5,000 in 1951 and debited the authority's account. In the usual course of business, both banks returned

the canceled checks with the forged endorsements thereon to the authority and presumably enclosed the customary statement of account showing the charges which had been made.

The officials of the housing authority did not become aware of these forgeries until 1956, when they demanded that the banks recredit the respective accounts in the full amounts of the wrongful payments. The Commonwealth Trust Company and The Trust Company of New Jersey refused to comply with these demands, which resulted in separate actions against them, seeking judgment against Commonwealth Trust in the sum of $1,716 and against The Trust Company of New Jersey for $5,000.

Each of the defendant banks moved for summary judgment in its favor, principally upon the basis of *N. J. S. A.* 17:9A–226(*B*) which provides:

> "No banking institution shall be liable to a depositor for an amount charged to * * * him because of the payment by the banking institution of a check * * * upon which the signature of any party, other than that of the depositor, was forged * * * unless, within two years after the return of such instrument to the depositor, he shall notify the banking institution in writing that the signature of a party to the instrument, other than that of the depositor, was forged * * *."

The trial judge granted defendants' motions and the authority took a consolidated appeal. We awarded certification on our own motion before argument could take place in the Appellate Division.

The appellant concedes *N. J. S. A.* 17:9A–226(*B*) would be dispositive if it were a private corporation. It urges, however, that the statute in question is one of limitation and contends that as a public corporation performing a governmental function it possesses the attribute of sovereign immunity which prevents the statute from running against it.

The fundamental premise underlying appellant's principal argument concerns the nature of *N. J. S. A.* 17:9A–226(*B*). If this provision is a statement of substantive law rather than a statute of limitations which controls procedure and affects only the availability of a

remedy, *Eureka Printing Co. v. Division of Employment Security*, 21 *N. J.* 383 (1956), appellant's conclusion is invalid and there is no need to precisely define its status and the character of its function since the authority cannot claim that, unlike ordinary private corporations, it is immune from the effect of general provisions of substantive law. In our view, *N. J. S. A.* 17:9A–226(*B*) does not establish a period of limitation. In wording, intention and effect it is essentially dissimilar.

■ A true statute of limitations prescribes a period within which suits must be brought upon claims or rights must be enforced. 1 *Wood, Limitations* (4th ed. 1916), § 1. The limitation is frequently defined as being the time at the end of which no action can be maintained. 34 *Am. Jur., Limitation of Actions*, § 3. Thus, our general statute, *N. J. S.* 2A:14–1 *et seq.*, provides that various causes "shall be commenced" within a designated period "after the cause of any such action shall have accrued."

■■ These statutes create repose. They are "practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Chase Securities Corp. v. Donaldson*, 325 *U. S.* 304, 314, 65 *S. Ct.* 1137, 1142, 89 *L. Ed.* 1628 (1945), quoted in *State by Parsons v. Standard Oil Co.*, 5 *N. J.* 281, 295 (1950). Their primary purpose is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend. History shows the first statutes of limitations were passed by the English Parliament when "abuses from stale demands became unendurable." 1 *Wood, supra*, at § 2.

*N. J. S. A.* 17:9A–226(*B*) has nothing in common with these enactments. It does not attempt to fix a period whose expiration will bar a depositor from maintaining an action to have his account recredited. Instead, the section under consideration goes to the very essence of the right by establishing a condition precedent to liability on the part of the

bank. A bank is not liable when it pays on a forged endorsement, contrary to the contract with its depositor, unless it is informed of such forgery within two years from the return of the forged instrument to the depositor. Thus, the purpose and effect of *N. J. S. A.* 17:9A–226(*B*) are vastly different from a limiting statute which merely prevents the obtention of a remedy after a stated period of time. *N. J. S. A.* 17:9A–226(*B*) does not attempt to designate when the action must be brought to retain its freshness.

Obviously, this provision of the Banking Act does not create repose. If the vouchers are never returned by the bank and received by the depositor, the statute is inapplicable. When notice is given within the allotted two-year period, the plaintiff-depositor still has the period of the general statute of limitations in which to sue. From this result, it is evident that *N. J. S. A.* 17:9A–226(*B*) was not designed "to prevent undue delay in bringing suit on claims and to suppress fraudulent and stale claims from being asserted, to the surprise of the parties or their representatives, when all the proper vouchers and evidence are lost, or the facts have become obscure from the lapse of time or the defective memory or death or removal of witnesses." 34 *Am. Jur., supra,* at § 10. It is completely alien to any limitation of the time in which suit may be brought.

An analysis of *N. J. S. A.* 17:9A–226(*A*) and (*B*) in conjunction with the common-law rules which preceded their passage is instructive.

*N. J. S. A.* 17:9A–226(*A*) relates to the situation where the depositor's own signature is forged or his instrument materially altered, in contrast with *N. J. S. A.* 17:9A–226(*B*) which is concerned with forged endorsements. The former section specifies that no "banking institution shall be liable to a depositor for an amount charged to or collected from him because of the payment by the banking institution of a check * * * upon which the signature of * * * the depositor, was forged * * * unless, within two years after the return of such instrument to the depositor, he shall notify the banking

institution in writing that his signature * * * was forged * * *."

At common law, a depositor could not hold his bank liable for honoring an instrument upon which his signature had been forged, or which had been materially altered, unless he examined his canceled checks within a reasonable time after their return and gave the bank notice of what had occurred. 7 *Am. Jur., Banks,* § 510. See also *Sprague v. West Hudson Cty. Trust Co.,* 92 *N. J. Eq.* 639 (*E. & A.* 1921); *Harter v. Mechanics National Bank,* 63 *N. J. L.* 578 (*E. & A.* 1899). Generally speaking, *N. J. S. A.* 17:9A–226(*A*) is a codification of this common-law duty, which conditioned the responsibility of the bank, with the modification that the Legislature has specifically defined a "reasonable time" as being two years. Certainly, the fact that a definite time for giving notice was set forth does not make *N. J. S. A.* 17:9A–226(*A*) a statute of limitations any more than the rule preceding it was a common-law limitation. In each instance, limiting the time for bringing an action was not involved. Both the common law and the statute express substantive rules of law placing an obligation upon the plaintiff which must be fulfilled before his cause of action can accrue and the defendant bank become liable.

Unlike the situation where the depositor's own signature was forged, at common law he usually had no duty to examine his vouchers within a reasonable time in order to determine whether any endorsements had been forged, since ordinarily they were not discoverable by such means, and it was only necessary for him to notify the bank within a reasonable time after such forgeries were actually discovered. 7 *Am. Jur., supra,* at § 512. See also *Sprague v. West Hudson Cty. Trust Co., supra; Harter v. Mechanics National Bank, supra.* Now, *N. J. S. A.* 17:9A–226(*B*) establishes a new duty on the part of the depositor. He must give notice of forged endorsements within two years after return of his checks as a condition to recovering wrongful payments. But does this make

*N. J. S. A.* 17:9A–226(*B*) any more of a statute of limitations than *N. J. S. A.* 17:9A–226(*A*)? Obviously not. Both sections define the relative rights and duties of the parties without adverting in any way to when an action must be brought to enforce them. The mere fact that a statute delineates the time within which a condition must be performed does not make it one of limitations.

In *Shattuck v. Guardian Trust Co.,* 204 *N. Y.* 200, 97 *N. E.* 517 (1912), the New York Court of Appeals was faced with the issue of whether § 326 of the New York Negotiable Instruments Law (*McK. Consol. Laws, c.* 38) was a statute of limitations. § 326 is comparable to our own *N. J. S. A.* 17:9A–226(*A*) in absolving a bank from liability for paying a forged or raised check unless notice thereof is given within one year. The court said, 97 *N. E.* at *page* 520:

"There is also a manifest difference between the statute which we are considering and the statute of frauds or the statute of limitations. For obvious reasons these latter statutes must be pleaded as defenses. They go to the remedy rather than the right, and if not pleaded are deemed waived. Upon first impression there is an apparent analogy between this section of the negotiable instruments law and a statute of limitations, but it quickly fails in the light of analysis. This law does not limit the time within which a depositor may bring suit against a bank. It simply declares that unless a depositor, whose money has been paid out on a forged or raised check, shall within one year after the return to him of the voucher of each payment 'notify the bank that the check so paid was forged or raised,' the bank shall not be liable. The depositor still has the right to bring suit at any time within the period fixed by any general statute of limitations. He may sue on the very day of making his deposit, and yet take a year from the time when his vouchers are returned to him in which to serve the notice required by the statute. If the vouchers are never returned to him, the statute has no application, for he is only compelled to serve the notice within one year after the return to him of the voucher of each payment upon which the bank relies. We regard this as one of those general statutes which promulgate rules of substantive law rather than of pleading or evidence * * *." Accord, *Markowitz v. Lincoln Nat. Bank,* 85 *N. Y. S.* 2d 821 (*Sup. Ct.* 1949).

Subsequent to the *Shattuck* decision, the New York Supreme Court, Appellate Division, had occasion to construe

§ 43 of the New York Negotiable Instruments Law (*McK. Consol. Laws*), which corresponds to *N. J. S. A.* 17:9A–226(B). In *Bloch v. Schwartz*, 266 *App. Div.* 188, 41 *N. Y. S. 2d* 837 (1943), it held:

"The present statute does not in terms establish a statute of limitations. It rather sets up a definite short period within which notification of the forged or unauthorized endorsement must be given to the drawee bank. In other words, it creates a condition to a claim of ultimate liability." (41 *N. Y. S. 2d* at *page* 839)

The *Bloch* case was specifically approved in *Commander-Larabee Milling Co. v. Manufacturers & Traders Trust Co., D. C.*, 61 *F. Supp.* 341, 343 (*W. D. N. Y.* 1945), where the court said:

"Section 43 does not by any expression make its application retroactive. No intent that it be retroactive can be clearly drawn from the language of the section. The statute creates a rule of substantive law. It is not a limitation statute nor is it to be construed as analogous to one, in so far as it affects vested rights of the plaintiff."

We conclude that the appellant authority is subject to the provisions of *N. J. S. A.* 17:9A–226(B), which is not in the nature of a statute of limitations.

*N. J. S. A.* 55:14A–7 provides that local housing authorities organized pursuant to statute shall have the power "to make and execute contracts and other instruments necessary or convenient to the exercise of [their] powers" and shall also have the authority "to sue and be sued."

█ The authority entered into contracts with the respondent banks when it opened its checking accounts. These agreements were not express in the sense that their terms were written out and subscribed to by the parties. As in the case of any other depositor, the contracts of deposit became subject to the provisions of the Uniform Negotiable Instruments Law and of the Banking Act.

Much has been written in the briefs concerning the function which appellant performs. The respondents character-

ize it as proprietary and urge the authority has no immunity even if *N. J. S. A.* 17:9A–226(*B*) be deemed a statute of limitations. In opposition, the authority points out that *N. J. S. A.* 55:14A–2 describes the clearing and reconstruction of slum areas as "governmental functions of State concern" and proposes that the controlling distinction is whether a public agency operates for a profit, citing *Cloyes v. Delaware Twp.*, 23 *N. J.* 324 (1957). Since *N. J. S. A.* 55:14A–8 specifically prohibits local housing authorities from making a profit, restricting the rents charged to a level sufficient to pay principal and interest on bonds and administration and maintenance costs, appellant argues that it is engaged in an exclusively governmental activity.

The *Cloyes* case dealt with the issue of whether a municipality was immune from liability for the torts of its agents, allegedly committed in the course of operating a municipal sewage disposal system on a utility basis. We held such an activity was proprietary in nature and, therefore, the defendant municipality had no immunity.

Despite resolving the case on this ground, Chief Justice Weintraub deprecated the wisdom and usefulness of continuing to maintain the distinction between governmental and proprietary functions, criticizing it as a spurious standard which failed to afford much guidance when measured against particular factual situations. He described the doctrine as an expedient engendered by policy considerations which militated for some relaxation of the early rule tending toward complete municipal immunity from liability in tort, and he conceded that many of the cases applying the purported governmental-proprietary distinction seemed to be irreconcilable. Nevertheless, we determined that *Cloyes* was not the case in which "to come to grips with the entire problem."

It is doubtful whether the governmental versus proprietary theory should be imported into our present endeavor, where it will probably prove to be no more serviceable than in the area of municipal immunity from liability in tort. A rule so frequently condemned should not be

expanded beyond its present scope of applicability unless such a result is essentially necessary.

Even if we were to consider the so-called distinction significant, the appellant nevertheless finds too much comfort in the *Cloyes* case when it asserts that proprietary activities are distinguished from governmental functions solely on the basis of whether or not they are conducted for profit. This criterion is formulated incorrectly and is also unwarrantably narrow since other factors materially contributed to the result reached.

Since difficulty is encountered in defining with logical precision what characteristics ultimately denote a governmental function, the courts naturally turn to historical experience for clarification. Thus, in the *Cloyes* case we emphasized that sewage disposal was not a service traditionally furnished by local government. To a greater degree, neither is low-cost housing. Prior to the enactment of the Local Housing Authorities Law in 1938, the supplying of private living quarters was typically and almost exclusively an activity conducted by private enterprise.

Another factor influencing the outcome of the *Cloyes* case was the absence of any general mandatory duty imposed by the Legislature upon municipalities to develop and maintain sewage disposal systems. Similarly, the Housing Authorities Law is permissive and does not require local governments to eliminate slum areas through the creation of an authority.

Moreover, contrary to appellant's suggestion, the result reached in *Cloyes* did not even partially depend upon whether the objective of the sewage disposal activity was to realize a net gain. The significant and controlling feature was that Delaware Township "conducted a business in essentially the same manner as a private utility." It was financed through charges to individual users and not by general taxation. Such is the situation before us, and Union City is gradually acquiring an equity in the premises as its bonds are amortized.

But it is not essential to choose between the governmental and proprietary designation, for regardless of which role the authority fills, when it came into the market place

it was cognizant of prevailing business practices and the provisions of the Banking Act and, inferentially at least, tendered itself willing to transact its business upon the customary terms and conditions then existing. If the authority had informed the respondents that it would not be bound by *N. J. S. A.* 17:9A–226(*B*), they probably would not have accepted its accounts. It cannot now disavow an agreement which it had the power to and did make. When seeking to avail itself of a commercial contract, appellant should be bound by all of its terms.

In a slightly different context, Justice Jacobs aptly expressed the dominant philosophy against affording special privileges and immunities to public corporations:

"The hostility towards the doctrine of governmental immunity is also evidenced in the states and it seems to us that pertinent statutory waivers should fairly receive as liberal construction in the states as in the federal sphere. In recent years there has been a noticeable tendency of legislative bodies to entrust to independent Authorities, functions which necessitate relationships comparable to those ordinarily existent between private parties. It would seem that in all justice such Authorities should generally not be afforded the highly special immunities of the State acting in its sovereign capacity * * *." *Taylor v. New Jersey Highway Authority*, 22 *N. J.* 454, 470 (1956).

One final point remains. Upon the assumption that *N. J. S. A.* 17:9A–226(*B*) is a statute of limitations, appellant argues the time allotted by the Legislature for giving notice is unreasonable.

 Having already concluded that the statute promulgates a rule of substantive law, the question of whether the two-year period is reasonable does not appear to be a controlling issue. Ordinarily, questions of reasonableness are reserved to the Legislature and reach the courts only in cases involving remedial statutes with retrospective operation. Since *N. J. S. A.* 17:9A–226(*B*) is prospective, see *Pratt v. Union Nat. Bank,* 79 *N. J. L.* 117 (*Sup. Ct.* 1909), and an expression of substantive law, the legislative decision should not be disturbed. In any event, the courts will not

set aside a statute of limitations "unless the time allowed is manifestly so insufficient that the statute becomes a denial of justice." 34 *Am. Jur., Limitation of Actions,* § 22. Clearly, that is not the situation here.

The judgments below are affirmed.

JACOBS, J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, JACOBS and FRANCIS—5.

*For reversal*—Justice HEHER—1.