86 N.J. Super. 13 (1964)
205 A.2d 753
RAINBOW INN, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
CLAYTON NATIONAL BANK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 23, 1964.
Decided December 18, 1964.
*15 Before Judges CONFORD, KILKENNY and LEWIS.
Mr. Neil F. Deighan, Jr. argued the cause for appellant (Messrs. Kisselman, Devine, Deighan & Montano, attorneys).
Mr. Albert G. Driver argued the cause for respondent.
*16 The opinion of the court was delivered by KILKENNY, J.A.D.
Plaintiff corporation sued defendant bank in the Gloucester County Court to recover the sum of $36,513.37, with interest, being the amount of 12 forged checks charged by the bank as drawee against plaintiff's checking account therein. After a trial without a jury, judgment was entered on August 2, 1963 in favor of plaintiff and against defendant in the sum of $33,013.37, with interest at 6% from May 14, 1961 and costs. As hereinafter noted, the difference of $3,500 between the amount sued for and the amount of the judgment represents a deposit in that amount in plaintiff's account presumably by the forger, subsequent to the forgery, which offset the first forged check in that amount. Plaintiff agrees that this $3,500 item was satisfied by the subsequent deposit. Defendant appeals from the judgment against it.
At the time in issue plaintiff was a family corporation, having its principal place of business in the Borough of Clayton, Gloucester County, and conducted a tavern and liquor package store business there. The corporation had only three stockholders, who were also its officers. Jean Wlodkowski was president of the corporation and had a 50% stock interest. Jean's nephew, Edmund Jezemski, was vice-president and owned 25% of the stock. Apolonia Jezemski, wife of Edmund, was secretary-treasurer and held the remaining 25% of the shares. The corporation had a checking account in defendant Clayton National Bank ever since 1953, and there had been no forgeries prior to the 12 in issue, all of which occurred between February 2 and May 14, 1962. Checks of the corporation required the signatures of all three officers.
It is conceded that Apolonia forged the signatures of the other two officers on the 12 checks in issue and appropriated the proceeds thereof to her own uses and purposes, without any authority from plaintiff corporation or the other officers and stockholders. It was not until May 17, 1962 that the other officers discovered the fact of Apolonia's wrongful conduct. On that day a bank statement was received at plaintiff's office *17 and, from a comparison of the beginning balance of $42,403.86 as of April 30, 1962 and the balance of $17,417.21 as of May 14, 1962, Edmund realized that something was amiss. He examined the checks and noted that the payees included some with whom plaintiff had no dealings. The next day Edmund and Jean informed defendant bank as to the forgeries.
Plaintiff had substantial balances in its checking account in defendant's bank at the times when the forgeries occurred. Bank statements issued at the times hereinafter noted showed the following respective balances:

 January 30, 1962 ................. $46,675.07
 February 26, 1962 ................ $47,331.71
 March 23, 1962 ................... $49,733.95
 April 30, 1962 ................... $42,403.86
 May 14, 1962 ..................... $17,417.21

Statements were issued by the bank at irregular times "whenever the sheet was filled up," and were either mailed or picked up by Apolonia. As the trial court properly noted, "the procedure most often practiced was to hand them to Apolonia." She kept the books of the corporation, attended to its banking, and was entrusted with the duty of reconciling the bank statements with the corporation's books. Thus, she was in an advantageous position to hide her misconduct from the other two officers, at least temporarily until the discovery on May 17, 1962.
The first three forged checks were honored by defendant on the following dates:

 $3500 ....................... February 2, 1962
 $5000 ....................... March 30, 1962
 $5000 ....................... April 23, 1962

The bank statements showing these deductions were never seen by plaintiff's other corporate officers but, as the trial judge found, "were picked up and hidden or destroyed by Apolonia Jezemski, the forger." She frequented defendant bank because of a series of personal loans and financing matters. *18 Presumably, too, she did so in the performance of her duties as secretary-treasurer of plaintiff. Her husband testified that during the period in question he did miss the statements, inquired about them once or twice at the bank, and was told on one occasion that the statements would be mailed to him and on another occasion that Apolonia had picked them up. He did not ask for duplicate statements.
The bank statement of March 23, 1962 was received by plaintiff. When sent out by the bank it showed a deposit of $3500 on March 7, 1962. This had been made by Apolonia, we presume, to cover the $3500 forged check of February 2, 1962. Thus, at this point, the bank balance coincided with the balance on plaintiff's books. But the March 7, 1962 deposit had been erased from this bank statement after it left the bank, before the other corporate principals saw the statement, thus hiding this evidence of the prior forgery. An item by item checkup would have revealed the discrepancy, but, as Edmund testified, he would usually look only at the balance on the bank statement. No running balance or list of deposits was maintained in the check book. Both Edmund and Jean Wlodkowski testified that they relied upon Apolonia to keep the books and balance the accounts.
The particulars of the other nine forged checks are as follows:

No. Date Payee Amount
3987 April 27, 1962 Apolonia A. Jazemski ................ $3500.00
3991 May 1, 1962 Joseph Durham & Co. ................. $4370.00
3989 May 6, 1962 Dealers Liquor Co. .................. $ 423.81
3990 May 6, 1962 Majestic Wine & Liq. ................ $ 754.01
3992 May 6, 1962 Goldstein & Goldstein ............... $1703.80
3993 May 6, 1962 Imperial Dist. Co. .................. $ 481.75
3498 May 7, 1962 Frank DiRenzo ....................... $ 900.00
3971 May 7, 1962 Johnson J. & A.A. Sitass ............ $9500.00
3972 May 7, 1962 Nicholas Dentino .................... $1380.00

As noted above, these nine forgeries were discovered by plaintiff immediately upon receipt of the bank statement mailed on May 16, 1962, and notice thereof was given to the bank the *19 next day. Thereafter, other checks similarly forged by Apolonia were not honored by the bank when they were presented for payment.
The forged checks were taken generally from plaintiff's extra check book available to all officers and kept in the file. Checks issued during this period from the check book normally used were numbered from approximately 3300 to 3418.
Despite their business association, Apolonia and Edmund had been estranged as husband and wife since 1959. While she maintained a room at Rainbow Inn in Clayton, she lived separate and apart from Edmund in another town where she conducted another tavern known as "Con's Inc." There was testimony that, about six months before the forgeries, Alpolonia had requested what she considered her share of plaintiff's money in the bank. She wanted a third thereof and wanted the other two officers to take a third. This request was refused. Thereupon, she told them that she was going to "get" her money.
Apolonia's pressure upon the other two for a split-up of the large amount on deposit was evidently induced by her desperate need of money to pay personal debts. The trial judge observed:
"She appears to the Court as one caught up in the vice of gambling and as a confessed forger and embezzler of thousands of dollars which she converted to her own use. The Court finds her evidence lacking in credibility."
The trial court found no credible evidence that Apolonia intended to use other than legal means to accomplish her purpose, or that forgery would become her modus operandi, with all the serious consequences attendant upon such criminal conduct. It gave no credence to a statement in her deposition that she had once threatened to sign all three names on checks, if they did not give her one-third of the money on deposit, and that Jean and Edmund had laughed at her and said, "Go ahead." We agree with this appraisal of Apolonia's credibility as to this statement in her deposition, especially in view of *20 her character as a self-confessed forger and the testimony of the other two officers inconsistent therewith.
The trial record shows that Edmund did know, at the time in issue, that on or about July 1, 1961 Apolonia had secured a loan in Philadelphia on an instrument purporting to bear his signature which he had not signed. Edmund was not absolutely certain who had forged his signature on this note, but his wife's signature also appeared on the same note. Edmund's Philadelphia attorney had been handling this matter in an effort to get it settled. However, there is a great measure of common sense in the trial court's observation as to Edmund's knowledge of this Philadelphia matter  that it had not been adjudicated in either the civil or criminal courts that Apolonia had forged her husband's name and "you would hardly expect a man to go to his bank and say his wife was a criminal and a forger." Nevertheless, the incident is part of the coloring in the factual picture to be considered with all the other evidence on the issue of plaintiff's possible negligence and its effect upon plaintiff's right to recover against defendant bank. In all events, the Philadelphia forgery did not pertain to Apolonia's performance as secretary-treasurer of plaintiff, a performance unmarked by any taint of wrongful conduct for some eight years prior thereto.
The record shows that there were times when defendant honored checks of plaintiff signed only by Edmund and his aunt, Jean, on occasions when Apolonia would not be available to add the required third signature. In the liquor business accounts must be kept current. However, Apolonia's signature would be subsequently placed on such checks at the bank when she attended there, even though the two-signature instruments had already been honored with payment. Such business courtesy is understandable and does not affect the issues herein. The bank did not like this practice and had told Apolonia and Edmund that it would have to cease.
Defendant does not question the fact that the signatures of Edmund and Jean, though "very close" to the genuine, were forged by Apolonia on the checks in issue. It concedes that it *21 honored those forged instruments with payment and charged plaintiff's account with the amounts thereof. It is admitted that Edmund and Jean notified the bank of the forgeries on the day following plaintiff's receipt on May 17, 1962 of the bank statement and cancelled checks, covering the period between April 30, 1962 and May 14, 1962. However, the bank contends before us, as it did before the trial court, that plaintiff is estopped from recovery because it was negligent in failing to examine the bank statements and cancelled checks and to discover the forgeries within a reasonable time after they were returned by the bank, and in neglecting to notify the drawee bank as to the forgeries within a reasonable time of the first of the series of forgeries perpetrated by its own dishonest employee.
Defendant relies upon N.J.S.A. 17:9A-226(A) and (C). Though repealed by the Uniform Commercial Code, L. 1961, c. 120, N.J.S.A. 12A:1-101 et seq., effective January 1, 1963, both sides agree that the case is governed by the statute in existence in 1962 when the incidents in issue took place. So far as pertinent here, N.J.S.A. 17:9A-226(A) provides:
"No banking institution shall be liable to a depositor for an amount charged to or collected from him because of the payment by the banking institution of a check * * * upon which the signature of the depositor was forged, or which was made * * * without authority, * * * unless, within two years after the return of such instrument to the depositor, he shall notify the banking institution in writing that his signature was forged or that the instrument was made * * * without authority * * *."
N.J.S.A. 17:9A-226(C) provides:
"No banking institution shall be liable to a depositor for an amount charged to or collected from him because of the payment by the banking institution of a check * * * upon which the signature of any party was forged * * *, if the banking institution shall establish
(1) that the depositor failed to exercise due diligence in discovering, and giving notice to the banking institution * * *; and
(2) that such lack of diligence contributed to the payment by the banking institution of an amount so charged * * * for the recovery of which the depositor seeks to hold the banking institution liable."
*22 The trial court concluded that defendant bank had failed to carry the burden of proof of its defense of negligence or failure of plaintiff to exercise due diligence in discovering the forgeries and notifying the bank thereof. In so doing it interpreted the words, "exercise due diligence," in N.J.S.A. 17:9A-226(C) to be synonymous with "acting with due or reasonable care," and concluded that one acted with due care if he acted within the "reasonable time" of "two years" prescribed by N.J.S.A. 17:9A-226(A). In so construing these sections of the statute, the trial court relied on the following excerpt from Union City Housing Authority v. Commonwealth Trust Co., 25 N.J. 330 (1957):
"At common law, a depositor could not hold his bank liable for honoring an instrument upon which his signature had been forged * * *, unless he examined his canceled checks within a reasonable time after their return and gave the bank notice of what had occurred. * * * Generally speaking, N.J.S.A. 17:9A-226(A) is a codification of this common-law duty, which conditioned the responsibility of the bank, with the modification that the Legislature has specifically defined a `reasonable time' as being two years." (at p. 337)
The trial court determined aliunde that return of the earlier bank statements to the forger, Apolonia, could not be considered a return to plaintiff because "The forger cannot be considered the agent of the victim."

I.
In our opinion, the trial court erroneously misinterpreted the relationship between subdivisions (A) and (C) of N.J.S.A. 17:9A-226 and misconstrued the above excerpt from Union City Housing Authority as equating the period of "two years" in (A) with the words "exercise due diligence" in (C).
In Union City Housing Authority, the forgeries occurred in 1950 and 1951, and the forger, executive director of the housing authority, obtained the bank statements and canceled checks from the drawee bank, as here, and concealed the *23 forgeries until 1956, when his misdeeds were discovered, and the officials of the housing authority then became aware of the forgeries for the first time. The housing authority sued the drawee banks and was held barred from recovery by reason of N.J.S.A. 17:9A-226(A). The housing authority sought to escape the legal consequences of that section of the statute on the ground that it was a public corporation performing a governmental function and was thus immune from the two-year limitation. The Supreme Court determined that the two-year provision was not a statute of limitations but a provision of substantive law, a condition precedent to liability, equally binding upon public as well as private corporations. Thus, the issue in Union City Housing Authority was different factually and legally from that herein, was not concerned with the interrelationship between subdivisions (A) and (C), and the case does not support the trial court's conclusion that a depositor necessarily exercises the "due diligence" referred to in (C) so long as he discovers the forgeries and notifies the bank within the "two years" prescribed by (A).
The purpose of N.J.S.A. 17:9A-226(A) was to fix an absolute time limit within which notice of the forgery must be given by the depositor to the bank and beyond which, if notice is not given, the bank would not be liable for paying a forged instrument and charging the depositor's account. Subdivision (C) furnishes an additional defense to the bank, where notice is given within the two-year period, by allowing it to establish that the depositor failed to exercise due diligence in discovering the forgery and giving the bank notice thereof, and such lack of diligence contributed to the payment by the bank. The construction of these two sections by the trial court would render subdivision (C) superfluous and meaningless. As stated in 2 Sutherland, Statutory Construction (1943), § 4705:
"A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error."
*24 The trial court's interpretation of subdivision (C) would mean that a depositor could sit idly by for a year and 11 months after receiving the bank statement and canceled checks, without examining them, or having examined them on the day he received them and having discovered a forgery, give no notice thereof until a day or two before expiration of the two-year period, and still recover from the bank because of the payments on the forgeries. We are satisfied that such was not the legislative intent in adopting subdivision (C) of N.J.S.A. 17:9A-226. See New Jersey Study Comments 2 and 4 to N.J.S.A. 12A:4-406, subdivisions (2) and (4), the Uniform Commercial Code successor to N.J.S.A. 17:9A-226(A) and (C). See, too, Clarke v. Camden Trust Co., 84 N.J. Super. 304 (Law Div. 1964), distinguishing between forged checks barred by the two-year provision under N.J.S.A. 17:9A-226(A) and other forged checks, not barred by (A), subject to the provisions of subdivision (C).

II.
We consider next whether the trial court's legal conclusion was correct when it ruled that defendant's delivery of the bank statements and canceled checks to Apolonia, secretary-treasurer of plaintiff, could not be considered a return to plaintiff because, as the forger, she could not be considered the agent of the victim.
The trial court's statement, "The forger cannot be considered the agent of the victim," is not universally true. It is true only in a limited sense, as Pannonia B. & L. Asso. v. West Side Trust Co., 93 N.J.L. 377, 384 (E. & A. 1919), points out, in citing with approval First National Bank of Richmond v. Richmond Electric Co., 106 Va. 347, 56 S.E. 152, 154 (Sup. Ct. App. 1907), which laid down the full and distinguishing rule that "a clerk is not the agent of his principal in the commission of a forgery, and his knowledge cannot be imputed to the principal, but, after forged checks have been paid and returned to the depositor as vouchers, along with his *25 account written up and balanced according to usual business methods, if the depositor assigns the duty of examining such vouchers and account to the same clerk, who has had an opportunity of committing a fraud and has done so, then such clerk, in the discharge of his duty, is the agent of the depositor, and the latter is chargeable with his agent's knowledge of the fraud."
Pannonia also adopted the rule, as expressed in Leather Manufacturers National Bank v. Morgan, 117 U.S. 96, 116, 6 S.Ct. 657, 29 L.Ed. 811 (1886), that a bank depositor has a duty, either in person or by duly authorized agent, to examine the account and vouchers returned by the bank within a reasonable time and give to the bank timely notice of any objections thereto. If the examination is made by an agent, it must be done in good faith and with ordinary diligence; and where such agent himself commits forgeries which mislead the bank and injure the depositor, the latter is not protected, in the absence of at least reasonable diligence in supervising the conduct of the agent. Where, as here, the agent has an interest in concealing the facts, the principal occupies no better position than he would have had if no one had been designated by him to make the required examination, "without, at least, showing that he exercised reasonable diligence in supervising the conduct of the agent while the latter was discharging the trust committed to him. In the absence of such supervision, the mere designation of an agent to discharge a duty resting primarily upon the principal cannot be deemed the equivalent of performance by the latter." 93 N.J.L., at p. 384.
The trial court expressed the opinion that the Pannonia case was distinguishable from the instant one in that (1) Pannonia was a business establishment supervised by state law, whereas this plaintiff is a family corporation, and (2) the forgeries by the treasurer of Pannonia included 32 checks extending over a period of four years, whereas there were only 12 forged checks herein extending over a period of a little more than three months. Those factual differences do not *26 alter or detract from the basic legal principles expressed in Pannonia, as noted above. "A bank depositor, on receiving from the bank a statement of his account, owes to the bank a duty to examine the account with reasonable dispatch and with reasonable care, and to inform the bank of any errors discovered therein." Forbes v. First Camden Nat. Bank & Trust Co., 25 N.J. Super. 17, 23 (App. Div. 1953). The depositor is not excused from the discharge of that duty by entrusting its performance to an incompetent or dishonest agent, in the absence of at least reasonable diligence in supervising the conduct of the authorized agent. In accord with the rule in Pannonia, see Clarke v. Camden Trust Co., 84 N.J. Super. 304, 311-312 (Law Div. 1964).
The Pannonia rule has been followed in many other jurisdictions. See, for example, Schwabenton v. Security National Bank, 251 N.C. 655, 111 S.E.2d 856, 858 (Sup. Ct. 1960); Clark-Kelley Livestock Auction Co. v. Pioneer Bank & Trust Co., 228 La. 224, 81 So.2d 869, 874 (Sup. Ct. 1955); Portsmouth Clay Products Co. v. National Bank of Portsmouth, 78 Ohio App. 271, 69 N.E.2d 653, 657 (Ohio Ct. App. 1946); Brunswick Corporation v. Northwestern Nat. Bank & Trust Co., 214 Minn. 370, 8 N.W.2d 333, 336, 146 A.L.R. 833 (Sup. Ct. 1943); Basch v. Bank of America etc., 22 Cal.2d 316, 139 P.2d 1, 8 (Sup. Ct. 1943); First National Bank of Richmond v. Richmond Electric Co., supra; Dana v. National Bank of the Republic, 132 Mass. 156 (Sup. Jud. Ct. 1882); Britton, Bills and Notes (1943), § 132, p. 608. The rule is well summed up in Screenland Magazine v. National City Bank, 181 Misc. 454, 42 N.Y.S.2d 286, 289 (Sup. Ct. 1943), wherein the court said:
"A depositor cannot be charged with the knowledge which the dishonest employee has gained while he was stealing from him * * *, but a `depositor must be held chargeable with knowledge of all the facts that a reasonable and prudent examination of the returned bank statements, vouchers and certificates would have disclosed had it been made by a person on the depositor's behalf who had not participated in the forgeries.'" *27 See, too, Morgan v. United States Mortgage & Trust Co., 208 N.Y. 218, 101 N.E. 871, 873 (Ct. App. 1913).
Therefore, in our view the trial court erred when it decided that the forger, Apolonia, could not be considered the agent of plaintiff in fulfilling plaintiff's duty to examine the returned bank statements and canceled checks to discover any irregularities therein.

III.
The trial court found that defendant bank had failed to carry the burden of proof of its defense of negligence or failure of plaintiff to exercise due diligence. That finding was evidently influenced by its misinterpretation of the relationship between N.J.S.A. 17:9A-226(A) and (C), and by its holding that the rule in the Pannonia case was not applicable herein.
The desirability of an expeditious disposition of the litigation induces us to make new or amended findings of fact, pursuant to R.R. 1:5-4(b), as applied to our court by R.R. 2:5. We find that plaintiff failed to exercise due diligence in discovering the initial forgeries by Apolonia and giving notice thereof to the bank, and that such lack of diligence contributed to the payment by the bank of the forged checks.
Reasonable diligence was not exercised by the other corporate officers in supervising the conduct of Apolonia, to whom plaintiff had entrusted its duty to examine the bank statements and canceled checks. Edmund looked only at the balances on the bank statements. Jean apparently made no check. Both relied almost entirely upon Apolonia. These two officers never saw the bank statements which reflected the three initial forgeries, whose early discovery and notice to the bank would have prevented the bank's honoring the last nine forged instruments. Nor did they press for copies of statements, as they should have, especially in the light of the strained domestic relationship, Apolonia's pressing need for money, their awareness *28 thereof, and the knowledge which Edmund had of the forged Philadelphia note.
Appropriate here is the following language in Morgan v. United States Mortgage & Trust Co., supra, 101 N.E., at p. 873:
"Negligence in this case means the neglect to do those things dictated by ordinary business customs and prudence and fair dealing toward the bank, which if done would have prevented the wrongdoing which resulted from their omission."
Plaintiff permitted Apolonia to perform her duties as secretary-treasurer in a slipshod, unbusinesslike manner. She made no entries of deposits in the check book and maintained no running balance therein. We can understand this tolerance because of the family relationship but it does not excuse plaintiff's negligence in relation to its present demand upon the bank. We can agree with the trial court that, "You would hardly expect a man to go to his bank and say his wife was a criminal and a forger." But, with that knowledge, plaintiff should have discontinued its laxity in merely spot-checking bank balances.
In legal contemplation, plaintiff knew of the first forgery on February 26, 1962, when the bank issued its statement and returned the $3500 forged check which it had honored on February 2, 1962. Plaintiff's exercise of due diligence at that time and notice then to the bank would have avoided the subsequent forgeries and, by reason of Apolonia's return of that $3500 in the form of the deposit on March 7, 1962, neither plaintiff nor defendant would have sustained any financial loss. Instead, plaintiff waited for some 14 weeks thereafter before notifying the bank, during which time Apolonia was able to mislead the bank into honoring 11 other forged instruments.
If plaintiff's officers, other than Apolonia, had carefully examined the bank statement of March 23, 1962, upon which the $3500 deposit made on March 7, 1962, covering the $3500 forged check of February 2, 1962, had appeared and had been *29 erased, it is reasonable to assume that Apolonia's initial forgery might well have been discovered and the series of forgeries thereafter avoided. Instead, there was, apparently, only a spot-check by Edmund of the balances at the beginning and end of the period. Simple addition and subtraction of the items on the bank statement would have revealed the discrepancy of $3500. An inquiry at the bank would have revealed the truth, even if a confrontation with Apolonia would not have done so.
In brief, Apolonia was plaintiff's trusted officer and the loss falls upon plaintiff because of its negligence in supervising her performance of the duty imposed by law upon plaintiff, as a depositor, and delegated by it to her.
The judgment in favor of plaintiff is reversed and, instead, judgment will be entered in favor of defendant.