WEST PARK AVE., INC., A BODY CORPORATE OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. TOWNSHIP OF OCEAN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND THE BOARD OF EDUCATION OF THE TOWNSHIP OF OCEAN, DEFENDANTS-RESPONDENTS.

Argued September 13, 1966—Decided November 7, 1966.

*Mr. Robert I. Ansell* argued the cause for appellant (*Messrs. Anschelewitz, Barr and Ansell,* attorneys).

*Mr. Bernard D. Karasic* argued the cause for respondent Township of Ocean (*Messrs. Karasic and Karasic,* attorneys).

*Mr. Samuel Y. Patterson* argued the cause for respondent Board of Education (*Mr. Henry H. Patterson,* of counsel; *Messrs. Patterson and Cooper,* attorneys).

The opinion of the court was delivered by

WEINTRAUB, C. J. Plaintiff sued to recover $17,700 which it paid defendants, allegedly under duress. The trial court found the payments were in fact made unwillingly but held they nonetheless were "voluntary" in law and therefore unrecoverable because plaintiff ought to have sued to restrain the defendant municipality from pressing its illegal demand. We certified plaintiff's appeal before argument in the Appellate Division.

I

Plaintiff acquired 60 lots from one Leon Massar, which lots were part of a subdivision plan. After completing a model home, plaintiff erected signs advertising its tract, whereupon plaintiff was told by municipal officials that it could not use a billboard or receive further building permits or certificates of occupancy unless it agreed to pay to the defendant Board of Education the sum of $300 per house.

As we have said, the trial court found that plaintiff yielded unwillingly to this imposition. That finding, we think, was inescapably correct. Plaintiff feared it could not survive if its project stood still during a period of litigation. It also sensed a danger of hostile enforcement of ordinances bearing upon the construction of homes. This was especially understandable because of the boldness with which the dollar demand was made, for the municipality did not so much as adopt an ordinance to give color to the exaction. Rather the demand was made at the administrative level by minor officials who, pursuant to instructions from above, simply refused to obey their duties of office.

When plaintiff yielded, counsel for the municipality prepared a writing, with a flimsy contractual overlay, calling for a payment of $300 "upon the closing of title and delivery

of deed to a purchaser for each house and lot," said moneys to be placed "in a trust fund or sinking fund, to be established for capital improvements of said school system and the erection of additional or adequate school construction in the said Township of Ocean." There were two such agreements, one executed in February 1959 for some of the 60 lots and the other in April 1960 for the balance of them.

In point of time, those transactions followed close upon our decision in. *Daniels v. Borough of Point Pleasant*, 23 *N. J.* 357 (1957), in which we struck down an ordinance which attempted to impose a tax for revenue purposes upon new construction. In form the ordinance increased the fees for building permits. We said (at *p.* 362) :

"* * * Admittedly, the purpose of the ordinance was to raise revenue to defray the increased cost of school and other government services. The philosophy of this ordinance is that the tax rate of the borough should remain the same and the new people coming into the municipality should bear the burden of the increased costs of their presence. This is so totally contrary to tax philosophy as to require it to be stricken down ; see *Gilbert v. Town of Irvington*, 20 *N. J.* 432 (1956). Admittedly, these fiscal problems confronting many of our rapidly growing municipalities are grave ones and would seem to call for legislative action ; the remedy must come not from the municipalities nor from the courts but from the Legislature."

The Legislature has not been unaware of the over-all problem. It dealt with it in its statute relating to subdivisions. *N. J. S. A.* 40 :55–1.21 reads :

"Before final approval of plats the governing body may require, in accordance with the standards adopted by ordinance, the installation, or the furnishing of a performance guarantee in lieu thereof, of any or all of the following improvements it may deem to be necessary or appropriate : street grading, pavement, gutters, curbs, sidewalks, street lighting, shade trees, surveyor's monuments, water mains, culverts, storm sewers, sanitary sewers or other means of sewage disposal, drainage structures, and such other subdivision improvements as the municipal governing body may find necessary in the public interest."

But with respect to the impact of housing developments upon the educational scene, the Legislature went no further than

to provide that the governing body or planning board "shall be permitted to reserve the location and extent of *school sites*, public parks and playgrounds shown on the master plan or any part thereof for a period of one year after the approval of the final plat or within such further time as agreed to by the applying party," but "Unless during such one-year period or extension thereof the municipality shall have entered into a contract to purchase or instituted condemnation proceedings according to law, for said school site, park or playground, the subdivider shall not be bound by the proposals for such areas shown on the master plan." *N. J. S. A.* 40:55–1.20. (Italics supplied.)

Thus the Legislature authorized the municipality to require a developer to install improvements which may be said to benefit peculiarly the land being developed. As to such improvements, it may be noted that if they were made by the municipality itself, it would be consistent with our general statutory thesis to recover the cost by special assessment upon the properties benefited. Hence the dollar burden upon the property is not significantly different whether the developer finances the improvement or pays for it after it is installed by the municipality. Moreover, when the developer finances the improvements, the initiative to go ahead remains with him, whereas if the municipality had to make the investment, it might not share the developer's optimism as to sales and might decline to act on that account.

But as to services which traditionally have been supported by general taxation, other considerations are evident. The dollar burden would likely be unequal if new homes were subjected to a charge in addition to the general tax rate. As to education, for example, the vacant land has contributed for years to the cost of existing educational facilities, and that land and the dwellings to be erected will continue to contribute with all other real property to the payment of bonds issued for the existing facilities and to the cost of renovating or replacing those facilities. Hence there would be an imbalance if new construction alone were to bear the capital cost of new

schools while being also charged with the capital costs of schools serving other portions of the school district. And if new construction were required in like manner to contribute specially to other programs supported by general taxation, for example, police and fire protection, then a municipality, if its hands were wholly unguided, could so deal with new housing as to burden, perhaps intolerably, the right of every citizen to seek a better home.

It is not our purpose to prejudge the constitutional power of the Legislature to authorize municipalities to impose charges such as the one here involved. As to that subject, see Heyman and Gilhool, "The Constitutionality of Imposing Increased Community Costs on New Suburban Residents through Subdivision Exactions," 73 *Yale L. J.* 1119 (1964); Reps and Smith, "Control of Urban Land Subdivision," 14 *Syracuse L. Rev.* 405 (1963); Note, 66 *Colum. L. Rev.* 974 (1966); *Midtown Properties, Inc. v. Madison Tp.*, 68 *N. J. Super.* 197, 210 (*Law Div.* 1961), affirmed o. b., 78 *N. J. Super.* 471 (*App. Div.* 1963); *Pioneer Trust and Savings Bank v. Village of Mount Prospect*, 22 *Ill.* 2d 375, 176 *N. E.* 2d 799 (*Sup. Ct.* 1961); *Gulest Associates, Inc. v. Town of Newburgh*, 25 *Misc.* 2d 1004, 209 *N. Y. S.* 2d 729 (*Sup. Ct.* 1960), affirmed 15 *A. D.* 2d 815, 225 *N. Y. S.* 2d 538 (*2d Dept.* 1962); *Jenad, Inc. v. Village of Scarsdale*, 23 *A. D.* 2d 784, 258 *N. Y. S.* 2d 777 (*2d Dept.* 1965), *reversed* 18 *N. Y.* 2d 78, 271 *N. Y. S.* 2d 955, 218 *N. E.* 2d 673 (1966); *Jordan v. Village of Menomonee Falls*, 28 *Wis.* 2d 608, 137 *N. W.* 2d 442 (*Sup. Ct.* 1965), appeal dismissed 87 *S. Ct.* 36 (Oct. 11, 1966); *Billings Properties, Inc. v. Yellowstone County*, 144 *Mont.* 25, 394 *P.* 2d 182 (*Sup. Ct.* 1964). Rather our point is that the Legislature has not committed that authority to local government.

There being no statutory authorization, it is clear the municipality could not have lawfully exacted the charges here involved. At the oral argument before us, defendants conceded this to be so. We have no doubt the municipality was conscious of the illegality of what it did and for that reason refrained from adopting an ordinance, seeking instead to

achieve its ends through the guise of "voluntary" contributions with spurious "agreements" to make them stick.

Defendants argue that even if the payments were illegally extorted, as we think they were, nonetheless plaintiff ought not recover for reasons to which we now turn.

## II

First, defendants say that before closing title plaintiff learned of the municipality's illegal practice and therefore should have rescinded its contract to buy.

It will be recalled that plaintiff bought the lots from one Massar. Massar apparently had entered into an "agreement" with the municipality to pay $300 per house. After plaintiff made the contract of purchase, its attorney ordered a tax search which revealed "$300 open as per contract with the Board of Education." Thus, prior to closing, plaintiff or its attorney had notice of some kind relating to the municipality's policy.

Defendants agree the quoted entry on the tax collector's records did not reflect a "tax" lien. In fact, nothing before us suggests the "agreement" with Massar even purported to encumber the property. Nor did the municipality deal with plaintiff on the hypothesis that the lands themselves were burdened. Rather the municipality pressed plaintiff to make a fresh agreement to contribute and exacted original agreements from plaintiff to that end.

Thus, the land not being encumbered, it is not at all clear that plaintiff could have avoided its contract with Massar. But whether it could have is wholly irrelevant. Defendants' position boils down to the proposition that one who buys with notice of municipal lawlessness thereby becomes bound by it. Thus understood, defendants' position is frivolous. *Cf. Wilson v. Borough of Mountainside*, 42 *N. J.* 426, 452 (1964). The irregular entry upon the tax records does not aid defendants at all. On the contrary, the entry serves only to evidence high-handedness and thus to support

plaintiff's fear that it would be dangerous to build while contesting the will of local government.

## III

Next, defendants say plaintiff's payments, although in fact made unwillingly, were nonetheless "voluntary" in law because plaintiff failed to resist the illegal demand by suit. This is the ground upon which defendants prevailed below.

█ It is usually said that payments are made under duress when (1) they are induced by the wrongful pressure of the payee and (2) the payor has no immediate and adequate remedy in the courts to resist them. *Ross Systems v. Linden Dari-Delite, Inc.*, 35 *N. J.* 329, 335 (1961). Defendants rely upon the second component.

█ Some authorities dispute the validity of the requirement that the victim of duress show he had no feasible remedy available to him. See *S. P. Dunham & Co. v. Kudra*, 44 *N. J. Super.* 565, 570–571 (*App. Div.* 1957). The point made is that if the payee's conduct is wrongful, nothing more should be demanded of the victim. We need not, however, say whether the criticism is correct. The situations are so varied that one cannot be sure of a simple formula. But it does seem safe to say that in evaluating the behavior of the parties, the nature and degree of wrongfulness of the payee may be the decisive factor.

For example, if the payee merely threatened to sue to recover a claim he held in good faith, it would ordinarily be unfair to permit his adversary to pay and litigate at a later date the question whether the claim against him was unfounded. See *Restatement, Restitution* (1937) § 71(1)(b). Absent some other oppressive circumstances, the payor should have met the claim when it was advanced. He ought not to have the right to select his own time to fight and thus leave the payee uncertain with respect to use of the moneys and perhaps at a testimonial disadvantage as a result of the passing of time.

In that category might be placed *Woodside Homes, Inc. v. Town of Morristown*, 26 *N. J.* 529 (1958), where the municipality refused to install water mains in a new development except at the builder's cost. It was there stressed that the city had no absolute duty to risk an investment in the developer's project and that whether its refusal to lay the mains was arbitrary was a matter to be decided initially by the Public Utility Commission (*p.* 539). The municipality's position could not therefore be said to be palpably wrongful (*p.* 545). Hence, although the developer by reason of his own plan may have felt a business compulsion to accept the city's terms, yet it would be unfair to permit the developer to pay and then seek a determination of the validity of the city's position. In other words, the city was entitled to a decision before the event rather than to be burdened thereafter with an unresolved claim.

On the other hand, the wrong of the payee may be so gross that nothing else is relevant. For an extreme example, a gunman may not retain the loot because his victim could have called the police, just as a swindler may not urge that his victim should have been more circumspect or astute. See *Judson v. Peoples Bank and Trust Co.*, 25 *N. J.* 17, 27 (1957); *Bilotti v. Accurate Forming Corp.*, 39 *N. J.* 184, 205 (1963); *Schoharie County Cooperative Dairies, Inc. v. Eisenstein*, 22 *N. J. Super.* 503, 514 (*App. Div.* 1952). The immorality of the demand so dominates the scene that the weakness of the victim can only accentuate the wrong.

In the case before us an unlawful demand was made with a consciousness of its unlawfulness. If it were crucial, we would not hesitate to say that plaintiff had no feasible remedy, both because of the pressure of its own financial picture and because of its fear of recrimination in other matters. But we prefer to say the wrong of the municipality was so palpable that it would be against good morals to permit defendants to complain that plaintiff was not valiant enough. Nor can we agree with defendants that they should be permitted so to say because they are governmental bodies. On

the contrary, the wrong is the more grievous because the power of public office was put behind it. As was said in *Robertson v. Frank Brothers Company*, 132 *U. S.* 17, 23, 10 *S. Ct.* 5, 6, 33 *L. Ed.* 236, 238 (1889), "When the duress has been exerted by one clothed with official authority, or exercising a public employment, less evidence of compulsion or pressure is required,— as where an officer exacts illegal fees * * *." There should be every inducement to local government to stay within the law. Accountability for moneys so flagrantly obtained serves that end.

## IV

■ Finally, defendants say the action is barred by laches. The payments were made from July 1959 into October 1961. This suit was started August 1, 1963. Plaintiff explains that it still holds one of the 60 lots and that prior to suit it was also concerned about possible retaliation with respect to other properties it had in the municipality. We need not, however, weigh the sufficiency of this explanation because the defense of laches is unavailing for several reasons.

To begin with, plaintiff asserts a claim cognizable at law. It is a conventional action to recover moneys, and apparently was brought in the Chancery Division because plaintiff feared, unnecessarily, that it might need equitable aid to rescind the "agreements" it signed under duress. The suit was started well within the statute of limitations, and the right asserted being a legal one, the statute controls in equity as well as at law, at least with respect to the demand for a money judgment. This is the usual rule. 2 *Pomeroy, Equity Jurisprudence (5th ed.* 1941), § 419e, *p.* 180; 27 *Am. Jur. 2d, Equity,* § 158. *p.* 694; § 160, *p.* 696; *Restatement, Restitution* § 148, comment *b, p.* 590 (1937); *Mott v. Iossa,* 119 *N. J. Eq.* 185, 192 (*Ch.* 1935); *cf. Bahr v. Breeze Corporations, Inc.,* 126 *N. J. Eq.* 124, 128 (*Ch.* 1939), affirmed o.b. 127 *N. J. Eq.* 257 (*E. & A.* 1940); *Merchants Indemnity Corp. v. Eggleston,* 37 *N. J.* 114, 132 (1962).

Moreover defendants did not make out the defense of laches, even if it were relevant. This is so for two reasons. First, there is no proof that defendants in fact were prejudiced by plaintiff's failure to make an earlier demand. Second, laches is not available to a conscious wrongdoer. See *Gallagher v. New England Mutual Life Ins. Co.*, 19 N. J. 14, 23 (1955) ; 3 *Pomeroy, Equity Jurisprudence* (*5th ed.* 1941), § 917, *p.* 600. One who extracts moneys from another knowing there is no warrant for the extraction cannot claim he was hurt because his wrong was not judicially denounced with sufficient speed. The hurt, if any, is of the wrongdoer's own making. In this connection, we note a parallel proposition relating to the doctrine of unjust enrichment, to the effect that one who acquires money by fraud or by duress cannot assert that his liability should be ended or reduced because of change of circumstances. *Restatement, Restitution* (1937), § 142(3)(a) and (b).[1]

## V

For these reasons, we are satisfied that plaintiff is entitled to judgment. We note that this result is supported by deci-

---

[1] Section 142 reads :

"(1) The right of a person to restitution from another because of a benefit received is terminated or diminished if, after the receipt of the benefit, circumstances have so changed that it would be inequitable to require the other to make full restitution.

(2) Change of circumstances may be a defense or a partial defense if the conduct of the recipient was not tortious and he was no more at fault for his receipt, retention or dealing with the subject matter than was the claimant.

(3) Change of circumstances is not a defense if

(a) the conduct of the recipient in obtaining, retaining or dealing with the subject matter was tortious, or

(b) the change occurred after the recipient had knowledge of the facts entitling the other to restitution and had an opportunity to make restitution."

Comment *c, p.* 573 reads in part :

"If the recipient has been fraudulent or guilty of duress not only is a defense of change of circumstances barred by the fact that his conduct was tortious, but also because of his knowledge of facts from which he had notice of the right of the claimant to the subject matter."

sions elsewhere. See *Rosen v. Village of Downers Grove*, 19 *Ill. 2d* 448, 167 *N. E. 2d* 230, 235 (*Sup. Ct.* 1960); *Gordon v. Village of Wayne*, 370 *Mich.* 329, 121 *N. W. 2d* 823 (*Sup. Ct.* 1963); *Ridgemont Development Co. v. City of East Detroit*, 358 *Mich.* 387, 100 *N. W. 2d* 301 (*Sup. Ct.* 1960); cf. *Kelber v. City of Upland*, 155 *Cal. App. 2d* 631, 318 *P. 2d* 561 (*D. Ct. App.* 1958); *Haugen v. Gleason*, 226 *Or.* 99, 359 *P. 2d* 108 (*Sup. Ct.* 1961); *Theatre Control Corp. v. City of Detroit*, 370 *Mich.* 382, 121 *N. W. 2d* 828 (*Sup. Ct.* 1963).

The judgment is reversed and the matter remanded to the trial court with directions to enter judgment in favor of plaintiff for $17,700 together with interest.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.