45 A.3d 332

THOMAS F. FOX; TARGET HOLDINGS, INC. D/B/A TARGET INDUSTRIES, PLAINTIFFS–APPELLANTS AND CROSS–RESPONDENTS, v. JEAN MILLMAN, DEFENDANT, AND POLYMER PACKAGING INC; LARRY LANHAM; BILL LANHAM, DEFENDANTS–RESPONDENTS AND CROSS–APPELLANTS.

Argued October 12, 2011—Decided June 20, 2012.

402

404

*Andrew J. Kyreakakis* argued the cause for appellants and cross-respondents.

*Arthur L. Porter, Jr.* argued the cause for respondents and cross-appellants (*Fischer Porter Thomas & Reinfeld,* attorneys; *Mr. Porter, Aaron E. Albert,* and *Albert O. Kwon,* on the briefs).

Justice HOENS delivered the opinion of the Court.

This appeal concerns a dispute between business competitors that arose after one of them hired an employee who had been terminated by the other. The dispute centers on allegations that the new employer thereafter benefited because that employee used a list of customers she implied was her own to generate business for her new employer when the list was instead the property of the former employer. That core dispute gave rise to a series of rulings by the trial court prior to and following a jury verdict based on special interrogatories, all of which was affirmed by the Appellate Division.

The parties have, through their cross-petitions, presented this Court with questions concerning: the interplay between the statute of limitations, the doctrine of laches, and the continuing wrong theory; the presumptive confidentiality of customer lists and whether a new employer should be charged with an affirmative duty of inquiry; the scope and availability of attorneys' fees; and the sufficiency of evidence that supported the jury's findings.

## I.

Although the essential facts that gave rise to the dispute can be succinctly stated, the complex procedural history of the litigation relating to the employee's work for her former employer, her termination, and its implications for the initiation of the matter now before this Court requires us to include a detailed factual recitation that will make our reasoning and our analysis of the issues clear.

### A.

Plaintiff Thomas F. Fox became the director of development for Target Industries, a corporation that manufactured and sold industrial plastic bags, in 1993. Target had been founded in 1975 by Martin Goz, and Fox was a long-time investor prior to assuming the director's position. After Target filed for Chapter 11 bankruptcy protection in 1999, Fox purchased all of its assets, including Target's "customer lists, price lists and other confidential and proprietary information and trade secrets." The assets were conveyed to Fox "AS IS, WHERE IS, without any warranty or representation of any kind" on May 15, 2001.

Defendant Jean Millman, who for reasons not relevant to this appeal did not participate in the trial, worked as a sales representative for Target beginning in 1988. Plaintiffs Fox and Target asserted that when Millman was hired, she signed a confidentiality agreement, which they contended could be found in a document that contained the following language:

> Upon leaving ... [Target], a Sales Professional shall promptly return all equipment, correspondence, and other papers/materials in his/her possession which relate to the business of Target Industries and shall not retain any copies of same. Target Industries may withhold commissions or salary until this condition is fulfilled.

By way of further explanation about the company's position concerning Millman's obligations to it, Target's former CEO Goz testified that he considered the company's sales files to be Target's property, and that salespeople were not allowed to take sales

files with them when they left the company's employ. Goz testified that he based his belief that the sales files were proprietary and confidential on the fact that Target "expended substantial time and resources to establish its customer accounts."

Millman's employment was terminated by Target on September 7, 2000, because Goz believed that she was disparaging Target and selling products on behalf of competitors during the pendency of Target's bankruptcy proceedings. The day after Millman's termination, Target's Bankruptcy Trustee sent Millman a cease-and-desist letter, which stated: "We understand that you have advised some of Target's customers that Target is no longer in business and . . . have attempted to solicit those customers' business for your own account." The letter further warned Millman that her actions might violate her "obligation to Target Industries under the terms of [her] employment," and that her "misrepresentations and statements are tortious and are interfering with the ongoing operations of Target's business." Finally, the letter asked Millman to return "all office equipment" and "original files" she had obtained while working for Target.

Three days later, on September 11, 2000, defendant Polymer Packaging Inc. hired Millman. Polymer, which is owned by defendants Larry and William Lanham, is located in Ohio. At all times relevant to the issues before this Court, Polymer also distributed industrial plastic bags, but unlike Target had no manufacturing facility.

When the Lanhams hired Millman, they knew that she had previously worked for Target. They asserted that they inquired of her as to whether she was subject to the terms of either a confidentiality agreement or a non-compete clause and that she assured them that she was not. Although Polymer required all of its employees, including Millman, to sign a confidentiality agreement, the Lanhams did not undertake to verify independently Millman's assertion that Target had not required her to do so.

The Lanhams conceded that Millman provided Polymer with a list of customers, but contended that she described it as a substan-

tial customer base that she had developed over the years, thereby implying that she had generated the list on her own. The list, which was given to Polymer and referred to in a confirming email, did not identify Target or bear any indication that it was not Millman's own. The Lanhams did not, therefore, undertake any further inquiry about the genesis of the customer list nor did they seek information about the list from Target.

After she was hired by Polymer, Millman solicited sales for that company from her home in Florida, receiving commissions on sales but no salary. During her deposition, Millman conceded that all of the sales contacts she had in the plastics industry when she began selling for Polymer had been derived from her work at Target. She admitted that she sold products for Polymer to former Target customers, but, consistent with her representations to the Lanhams before she was hired, she denied that she was bound by any confidentiality or non-compete agreement with Target.

Millman left Polymer in October 2004 for reasons unrelated to the matters in dispute. Prior to her separation from Polymer, however, she was responsible for generating substantial sales for the company. One of plaintiffs' experts at trial quantified Millman's sales for Polymer as totaling $5.1 million for the period from the start of her employment through 2005.

### B.

Plaintiffs initially filed their complaint on January 20, 2004, naming as defendants Millman and fictitious parties in place of her subsequent employer. That complaint asserted claims of misappropriation of proprietary and confidential information; tortious interference with business relations and prospective economic advantage; unfair competition; unjust enrichment; conversion; breach of the duty of loyalty; and conspiracy.

Plaintiffs contended that they first discovered that Millman had been hired by and had worked for Polymer a year later, when she answered their interrogatories. At that time, they were granted

leave to amend their complaint and substitute Polymer and the Lanhams, individually, as defendants for the previously named fictitious parties.

Following discovery, the parties filed cross-motions for summary judgment. Although both of the motions were denied, the arguments raised by the parties in those motions formed the framework for the issues that were presented to the jury at trial and that are now before this Court on appeal.

Plaintiffs asserted that they were entitled to summary judgment because the customer list that Millman took was proprietary and confidential material and that defendants must have been aware that it was Target's property. In support of that argument, plaintiffs pointed out that the accounting experts for both parties had opined that customer lists are generally regarded as proprietary assets. Moreover, plaintiffs argued that Polymer's use of confidentiality agreements with all of its salespeople, including Millman, demonstrated that it should have known that customer lists in the plastic bag industry were confidential and proprietary. Finally, plaintiffs asserted that because Millman sent the list to Polymer immediately after she left Target, and because Millman immediately started soliciting those clients, Polymer must have known the list identified Target customers.

In denying that motion, the trial court concluded that there were genuine issues of material fact concerning what defendants knew or should have known about the origin of the customer list, and concerning whether the list was considered to be confidential or proprietary information. Further, the trial court rejected plaintiffs' argument that such lists are presumptively confidential and declined to impose upon defendants an affirmative duty to inquire independently as to the source or ownership of the information contained in the list.

Defendants' motion for summary judgment was based on the assertion that plaintiffs' claim was barred by the affirmative defense of laches. Defendants pointed to several facts in support of their laches argument. First, they asserted that Target knew it

had a potential claim as early as September 8, 2000, when the Bankruptcy Trustee sent Millman the cease-and-desist letter.

Second, defendants argued that plaintiffs intentionally delayed suing Millman because she had evidence they wanted to use in separate, unrelated bankruptcy litigation against Goz and other former Target employees. In support of that assertion, defendants produced documents from May and August 2001 demonstrating that Target's Bankruptcy Trustee had discussed Millman's solicitation of Target employees with her but declined to pursue that claim because he was concerned that Millman would then not be willing to provide the evidence she had about Goz. Those documents also revealed that although Fox was frustrated that Millman "took several accounts," he understood why she was not being pursued. Defendants also relied on correspondence dated June 18, 2001, in which the Bankruptcy Trustee assured Millman that she had not been sued and suggested that by cooperating with Target in the suit against Goz she would not be sued in the future, in order to demonstrate that plaintiffs made a conscious choice not to pursue litigation.

In further support of their laches arguments, defendants contended that plaintiffs had ample opportunity to discover who Millman's new employer was, but made no effort to do so, thus making the delay both unfair and unreasonable to defendants. Moreover, they asserted that the delay in filing the complaint was unduly prejudicial because it exposed defendants to greater liability based on the sales Millman generated and deprived them of the opportunity to cut ties with Millman and reduce that potential damage award.

Plaintiffs opposed defendants' laches motion by raising two arguments. First, they contended that their complaint was filed within the applicable six-year statute of limitations, *N.J.S.A.* 2A:14-1, which made it timely notwithstanding defendants' invocation of laches. Second, they asserted that defendants could not prove undue delay or prejudice, largely because, by failing to

inquire independently about the customer list, they had not acted in good faith.

In addressing defendants' laches argument, the trial court acknowledged that plaintiffs' complaint was timely when tested against the applicable six-year statute of limitations, but concluded that defendants could invoke the defense of laches because plaintiffs' delay was both unreasonable and prejudicial. Nevertheless, the trial court declined to grant summary judgment to defendants based on laches, concluding that there remained genuine issues of material fact with respect to whether defendants acted in good faith, which needed to be resolved in order to permit the proper application of the doctrine.

## C.

During the jury trial that followed, the parties presented proofs in addition to those submitted to the court in support of the summary judgment motions. In summary, plaintiffs' expert accountant estimated that between 1995 and 2000, Target had expended $23 million to find and maintain customers. Based on his evaluation of the list of clients that Millman took to Polymer, the expert estimated that the diverted sales represented $1.8 million in net profits that Target had lost. In addition, plaintiffs elicited concessions from Larry Lanham that when Polymer hired Millman, he was aware that Target was the only other plastics company for which Millman had ever worked and that Polymer invested "nothing" in the development of Millman's customer list. In an effort to demonstrate that defendants did not act in good faith and therefore could not claim the benefit of a laches defense, plaintiffs presented evidence that on December 17, 2003, Polymer had received written notice about plaintiffs' claim but continued to sell products to former Target customers, even continuing to do so after the complaint in this litigation was filed.

During the presentation of their proofs, defendants sought to bolster their laches defense with additional evidence. They pointed to a July 12, 2002, deposition in Target's bankruptcy litigation

taken when Fox was present, during which a Target employee testified that he believed Millman was working for "a company out of Ohio, the name Polymer something." Moreover, defendants asserted that the Lanhams had clean hands because they never personally saw the customer list that Millman sent Polymer and that all of the defendants had clean hands because the list contained no clear indication that it came from Target. Conceding that customer information is generally considered to be proprietary, Larry Lanham testified that he would not have sought information of that type from Millman. He asserted that were an employee to attempt to provide him with another company's customer list, he would not consider it to be "fair play" and would likely terminate that employee.

In their defense of plaintiffs' substantive claims, defendants presented testimony of two former Target employees who testified that they never signed confidentiality or non-compete agreements and that they were not aware of policies or guidelines that precluded them from attempting to sell to Target customers after leaving Target's employ. One of the two testified further that although he left Target and then continued to sell to its clients, the company did not pursue any claims against him.

Before the dispute was presented to the jury, the parties submitted their requested charges and the court considered the order and manner in which the claims would be considered by the jury. The disputed issues therefore were presented to the jury through a lengthy series of special interrogatories, each of which requested the jury to make particularized findings of fact that the trial court would then be able to mold into a verdict.

Following its deliberations, the jury responded to the special interrogatories. Those responses represented the jury's findings that plaintiffs unreasonably delayed filing their lawsuit and that defendants were prejudiced by that delay; that defendants acted in good faith when they solicited Target clients and had no reason to know that Millman had breached a confidence by soliciting former Target clients; and that Target's Bankruptcy Trustee

engaged in misrepresentation when he told Millman she would not be sued.

Having received the jury's answers to the special interrogatories, the trial court concluded that defendants had proven their entitlement to the affirmative defense of laches, as a result of which the court entered judgment dismissing plaintiffs' complaint with prejudice. Thereafter, plaintiffs' motion for judgment notwithstanding the verdict was denied, based on the trial court's reiteration of its conclusion that the laches defense could be raised in response to a complaint filed in compliance with the otherwise applicable statute of limitations. Moreover, the trial court concluded that it was permitted to afford defendants the benefit of the equitable laches defense based on the factual findings made by the jury, finding in them sufficient support for the conclusions that defendants had been prejudiced by the delay and had not acted with unclean hands. Reasoning that defendants had no basis on which to conclude that the customer list Millman provided to them was not hers but was the property of her former employer, the trial court concluded that there could be no showing of misappropriation.

Following the entry of judgment of dismissal, defendants moved for an award of attorneys' fees, arguing that the complaint was frivolous, *see N.J.S.A.* 2A:15–59.1(a)(1); *R.* 1:4–8, that plaintiffs raised a factual issue in bad faith at the summary judgment stage, *see R.* 4:46–6, or, in the alternative, that fees were appropriate based on plaintiffs' failure to accept their offer of judgment, *see R.* 4:58–3. The trial court denied defendants' fee request, rejecting each of the proffered grounds.

The Appellate Division, in response to the parties' cross-appeals, affirmed the trial court's application of the doctrine of laches, its entry of judgment dismissing the complaint based on the jury's answers to the special interrogatories, and its rejection of defendants' requests for an award of counsel fees.

Thereafter, the parties filed their cross-petitions for certification, both of which we granted. 205 *N.J.* 16, 11 *A.*3d 374 (2010).

## D.

Plaintiffs' petition for certification asserts that it was error for the trial court to permit defendants to raise the defense of laches. In particular, they argue that permitting a laches defense, in circumstances in which the statute of limitations has not expired, will erase clearly defined deadlines and therefore will create ambiguity, lead to confusion and engender inconsistent results in application. Further, plaintiffs assert that the trial and appellate courts erred in rejecting the continuing violation doctrine, in misapplying settled precedents from this Court recognizing that customer lists are protected as trade secrets, and in failing to require defendants to inquire independently about the proprietary nature of the customer list prior to utilizing it.

Defendants, in their cross-petition, argue that they are entitled to an award of attorneys' fees either because the complaint was frivolous or because of plaintiffs' failure to accept their offer of judgment. In addition, defendants argue that the trial and appellate courts erred in failing to recognize that they were entitled to a grant of summary judgment or involuntary dismissal on all of plaintiffs' claims.

## II.

Our analysis of the issues raised in the cross-petitions begins with our consideration of whether the trial and appellate courts erred in permitting defendant to assert laches as a defense to a complaint otherwise timely filed in compliance with the applicable statute of limitations.

## A.

Our Legislature has enacted statutes of limitations, including the general one authorizing commencement of a cause of action within six years of accrual, *N.J.S.A.* 2A:14–1, that plaintiffs contend should apply to their claims against defendants and that would render those claims timely. We have recognized that "[a]n

underlying purpose of statutes of limitations is to reduce uncertainty concerning the timeliness of a cause of action." *McGrogan v. Till,* 167 *N.J.* 414, 426, 771 *A.*2d 1187 (2001) (citation omitted). The United States Supreme Court has observed that the purpose of statutes of limitations is to "promote repose by giving security and stability to human affairs." *Wood v. Carpenter,* 101 *U.S.* 135, 139, 25 *L.Ed.* 807, 808 (1879). Moreover, that Court has noted that statutes of limitations "are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Chase Sec. Corp. v. Donaldson,* 325 *U.S.* 304, 314, 65 *S.Ct.* 1137, 1142, 89 *L.Ed.* 1628, 1635 (1945).

We have explained that the "primary purpose" of "our general statute [of limitations], *N.J.S.A.* 2A:14-1, . . . is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend." *Hous. Auth. of Union City v. Commonwealth Trust Co.,* 25 *N.J.* 330, 335, 136 *A.*2d 401 (1957). Significant for the matter now before us, we have also noted that "[s]tatutes of limitation cannot promote greater certainty when decisions inject ambiguity into their application." *McGrogan, supra,* 167 *N.J.* at 426, 771 *A.*2d 1187.

▪ Notwithstanding all of those salutary purposes of statutes of limitations, we have not always applied them strictly, but have in certain circumstances concluded that they are subject to equitable constraints. The discovery rule is perhaps the most familiar equitable doctrine that has been applied to the operation of a statute of limitations, and it has been used to toll the otherwise applicable time frames. As we have explained, the "equitable principle of the discovery rule . . . delays accrual of a cause of action" until the injured plaintiff discovers, or should have reasonably discovered, "a basis for an actionable claim." *Guichardo v. Rubinfeld,* 177 *N.J.* 45, 51, 826 *A.*2d 700 (2003) (citation and internal quotation marks omitted); *Lopez v. Swyer,* 62 *N.J.* 267, 274, 300 *A.*2d 563 (1973) (reasoning that it is "inequitable that an

injured person, unaware that he has a cause of action, should be denied his day in court solely because of his ignorance, if he is otherwise blameless"). Although most frequently applied in the context of malpractice litigation, this Court has found a basis to invoke the discovery rule in other circumstances as well. *See O'Keeffe v. Snyder,* 83 *N.J.* 478, 491, 416 *A.*2d 862 (1980) (holding in replevin action for recovery of stolen painting that "[i]n certain instances ... the literal language of a statute of limitations should yield to other considerations").

Similarly, we have invoked the equitable remedy known as the continuing violation doctrine to allow plaintiffs to pursue a cause of action even after strict application of a statute of limitations would bar relief. *See Shepherd v. Hunterdon Developmental Ctr.,* 174 *N.J.* 1, 6–7, 803 *A.*2d 611 (2002) (recognizing exception to two-year statute of limitations applicable to hostile work environment claim in which employee demonstrates pattern of continuing violations); *see also Mancini v. Twp. of Teaneck,* 179 *N.J.* 425, 431, 436–38, 846 *A.*2d 596 (2004) (explaining that "[b]y definition, the continuing violation doctrine exposes a defendant to liability for acts that, standing alone, might have occurred outside the limitations period").

In addition, although it is not strictly a statute of limitations, we have permitted the invocation of the doctrine of laches in the analogous context of applying the Affidavit of Merit's statutory limitation on claims sounding in malpractice. *See Knorr v. Smeal,* 178 *N.J.* 169, 181, 836 *A.*2d 794 (2003) (citation omitted). In *Knorr,* plaintiffs failed to serve defendants with an Affidavit of Merit within the time allowed by the statute, *see N.J.S.A.* 2A:53A–27, a shortcoming that ordinarily would result in dismissal of the claim, *ibid.; see Knorr, supra,* 178 *N.J.* at 173–74, 836 *A.*2d 794. In addressing the circumstances presented in that record, we observed that defendant did not promptly file his motion to dismiss, but instead "engaged in the exchange of interrogatories, deposed plaintiffs and submitted to a deposition, obtained plaintiff's expert report, and had plaintiff physically examined." *Id.* at

174, 836 *A*.2d 794. In that context, we applied the doctrines of laches and equitable estoppel and barred dismissal because defendant had "slept on his rights." *Id.* at 181–82, 836 *A*.2d 794. We rejected defendant's argument that "because the Legislature was silent in setting a timeframe for the filing of a motion to dismiss . . . there are no time limits." *Id.* at 182, 836 *A*.2d 794. Instead, this Court applied the equitable remedy because the "stated intent of the [Affidavit of Merit] statute was to screen out meritless malpractice lawsuits at an early stage in the litigation," *ibid.*, a goal that was not advanced by defendant's delay.

In each of these circumstances, the use of the equitable doctrine was justified because equity, or fairness, demanded it. In each, either the application of the doctrine resulted in the extension of the time to pursue a cause of action that would otherwise be barred, as through the use of the discovery rule, *see Lopez, supra,* 62 *N.J.* at 274, 300 *A*.2d 563, or the continuing violation doctrine, *see Shepherd, supra,* 174 *N.J.* at 6–7, 803 *A*.2d 611, or the application of the doctrine resulted in the continuation of a claim notwithstanding the failure to strictly comply with a statutory requirement, as in the Affidavit of Merit statute, *see Knorr, supra,* 178 *N.J.* at 182, 836 *A*.2d 794. That is, in each instance, laches effectively granted a plaintiff rights broader than those that would have applied had the statute of limitations been strictly enforced.

The issue raised in this appeal is whether the equitable doctrine of laches may be used to achieve the opposite result, by shortening, rather than extending, the time for filing a claim at law. The question turns on whether it is appropriate to utilize an equitable remedy to foreclose a claim otherwise governed by a fixed statute of limitations and otherwise filed in compliance with that time constraint. We begin with a brief review of the essential principles that guide our consideration of this question.

■ Laches is an equitable doctrine, operating as an affirmative defense that precludes relief when there is an "unexplainable and inexcusable delay" in exercising a right, which results in prejudice to another party. *Cnty. of Morris v. Fauver,* 153 *N.J.* 80, 105, 707

A.2d 958 (1998) (citations omitted); *see also Nw. Covenant Med. Ctr. v. Fishman,* 167 *N.J.* 123, 140, 770 *A.*2d 233 (2001). It is an equitable remedy that we have frequently described as " 'an equitable defense that may be interposed in the absence of the statute of limitations.' " *Borough of Princeton v. Bd. of Chosen Freeholders,* 169 *N.J.* 135, 157, 777 *A.*2d 19 (2001) (quoting *Nw. Covenant, supra,* 167 *N.J.* at 140, 770 *A.*2d 233).

As we have explained, laches is "invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party." *Knorr, supra,* 178 *N.J.* at 180–81, 836 *A.*2d 794; *see Cnty. of Morris, supra,* 153 *N.J.* at 105, 707 *A.*2d 958. "Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned." *Knorr, supra,* 178 *N.J.* at 181, 836 *A.*2d 794.

Our courts have long recognized that laches is not governed by fixed time limits, *see Hinners v. Banville,* 114 *N.J. Eq.* 348, 357, 168 *A.* 618 (E. & A.1933) ("Laches involves something more than mere delay, mere lapse of time."), but instead relies on analysis of time constraints that "are characteristically flexible," *Lavin v. Bd. of Educ.,* 90 *N.J.* 145, 151, 447 *A.*2d 516 (1982). Unlike the mechanical application of a fixed time prescribed by a statute of limitations, laches operates as do other equitable doctrines. That is, "[w]hether laches should be applied depends upon the facts of the particular case and is a matter within the sound discretion of the trial court." *Mancini, supra,* 179 *N.J.* at 436, 846 *A.*2d 596 (quoting *Garrett v. Gen. Motors Corp.,* 844 *F.*2d 559, 562 (8th Cir.), *cert. denied,* 488 *U.S.* 908, 109 *S.Ct.* 259, 102 *L.Ed.*2d 248 (1988)).

Although laches therefore is most frequently considered in circumstances in which there is no statute of limitations, courts in New Jersey, including this Court, have occasionally commented on its implications in cases governed by statutes of limitations as well.

In considering the matter now before us, both the trial and appellate courts looked to three such published decisions as support for the conclusion that laches could be used to shorten the time to pursue a cause of action otherwise governed by a statute of limitations. Their consideration of these precedents requires us to analyze them in some detail.

 Traditionally, there is not only a distinction drawn between suits in equity and actions at law, but there is a recognized difference in the operation of the equitable doctrine of laches arising from that distinction between equity and law. The United States Supreme Court has observed that if a suit in equity raises claims as to which there is an applicable statute of limitations, there is nevertheless a role for the equitable doctrine of laches. *Patterson v. Hewitt*, 195 *U.S.* 309, 318, 25 *S.Ct.* 35, 37, 49 *L.Ed.* 214, 218 (1904). As the Court explained, in that circumstance,

> the statute [of limitations] is in terms applicable to suits in equity, as well as at law, it is ordinarily construed, in cases demanding equitable relief, as fixing a time beyond which the suit will not under any circumstances lie, *but not as precluding the defense of laches, provided there has been unreasonable delay within the time limited by the statute.*
>
> [*Ibid.* (emphasis added).]

In other words, "[i]n an action at law courts are bound by the literalism of the statute, but in equity the question of unreasonable delay within the statutory limitation is still open." *Ibid.* (citation omitted). On the other hand, if the suit is solely one at law rather than in equity, the United States Supreme Court has held that applying "[l]aches within the term of . . . [the governing] statute of limitations is no defense at law." *United States v. Mack*, 295 *U.S.* 480, 489, 55 *S.Ct.* 813, 818, 79 *L.Ed.* 1559, 1565 (1935).

 This Court has traditionally hewed to this distinction between law and equity in considering the application of the doctrine of laches. In rejecting the application of a laches defense in an action at law, we have commented that where "[t]he suit was started well within the statute of limitations, and the right asserted being a legal one, the statute controls in equity as well as at law, at least with respect to the demand for a money judgment.

This is the usual rule." *West Park Ave., Inc. v. Ocean,* 48 *N.J.* 122, 131, 224 *A.*2d 1 (1966) (Weintraub, C.J.). In contrast, laches will ordinarily be utilized in suits brought in equity. As the chancery court has held, "if the subject matter in controversy in a Court of Chancery is of an equitable nature, not cognizable in a court of law, statutes of limitations although not ignored have no obligatory application, but the court will instead apply the doctrine of laches." *Hyland v. Simmons,* 152 *N.J.Super.* 569, 576, 378 *A.*2d 260 (Ch.Div.1977), *aff'd,* 163 *N.J.Super.* 137, 394 *A.*2d 376 (App. Div.1978), *certif. denied,* 79 *N.J.* 479, 401 *A.*2d 234 (1979) (citation omitted).

Notwithstanding the interplay between the statutes of limitations and laches arising from the traditional distinction between matters in law and suits in equity, this Court has applied the doctrine of laches to conclude that a claim derived from a statutory right had been lost through failure to make a timely demand therefor. *See Lavin v. Hackensack, Bd. of Educ.,* 90 *N.J.* 145, 152, 447 *A.*2d 516 (1982). We recognized that plaintiff's claim for increased wages, which was based on employment credits due to military service, was governed by statute and not by the employee's contract. *Id.* at 151, 447 *A.*2d 516. However, because it was a statutory right rather than a contractual one, we concluded that it was not governed by any statute of limitations. *Ibid.* We therefore deemed it entirely appropriate to apply the equitable doctrine of laches, which ordinarily "operates as a bar in a court of equity," *ibid.* (quoting 2 *Equity Jurisprudence* § 419, at 171–72 (5th ed. 1941)), to the statutory claim, commenting that this "equitable defense that may be interposed *in the absence of the statute of limitations,*" *ibid.* (emphasis added). We have relied on this reasoning to conclude that the doctrine of laches may be applied when there is no otherwise-applicable statute of limitations. *Borough of Princeton, supra,* 169 *N.J.* at 157, 777 *A.*2d 19; *Nw. Covenant, supra,* 167 *N.J.* at 141, 770 *A.*2d 233.

Although our discussion in *Lavin, supra,* 90 *N.J.* at 151, 447 *A.*2d 516, was limited to making a laches approach available only

when there is no governing statute of limitations, the opinion included a footnote, which became the focus for defendants in this dispute and which was relied upon by both the trial and appellate courts in their analysis. That footnote comments that

> [w]here a legal and an equitable remedy exist for the same cause of action, equity will generally follow the limitations statute. *See Cole v. Brandle,* 127 *N.J. Eq.* 31, 38 [11 *A.*2d 255] (E. & A.1940). Where the equitable cause of action is analogous to the one at law, laches may depend solely on the comparable statute of limitations. *See* discussion in *Story,* 1 *Equity Jurisprudence* 61–62 (13th ed. 1886).
>
> *Because laches is an equitable principle aimed to promote justice, conditions or circumstances may make it inequitable to prosecute a claim after a period shorter than that fixed by the statute of limitations. Thus where there has been an unreasonable delay, laches has been applied to defeat a claim despite the fact that the time fixed by the analogous statute of limitations has not passed. Patterson v. Hewitt,* [*supra,* 195 *U.S.* at 319, 25 *S.Ct.* at 37, 49 *L.Ed.* at 218]. Even if the cause of action in this case were deemed to be similar to a claim for breach of contract, it would be appropriate to consider the applicability of laches.
>
> [*Id.* at 153 n. 1, 447 *A.*2d 516 (emphasis added).]

In this appeal, defendants assert that the trial and appellate courts correctly concluded that it was appropriate to utilize laches to bar an action at law that was commenced within the otherwise applicable period fixed by the statute of limitations. In reaching that conclusion, the trial court relied on the footnote in *Lavin,* the general description of the doctrine of laches found in *Knorr,* and a Chancery Division decision that applied laches in the context of an insurance coverage dispute, *see Allstate v. Howard,* 127 *N.J.Super.* 479, 489, 317 *A.*2d 770 (Ch.Div.1974). The Appellate Division, in affirming the trial court, also found support in another appellate level decision that applied laches to bar prosecution of an otherwise-timely lawsuit between a lawyer and the estate of his deceased partner that arose out of their agreement concerning the dissolution of their partnership. *See Chance v. McCann,* 405 *N.J.Super.* 547, 966 *A.*2d 29 (App.Div.2009).

Our analysis of this dispute leads us to a different conclusion than the one reached by the trial and appellate courts. In short, the trial court misapplied the precedents on which it relied and the Appellate Division inappropriately extended its own application of laches from the truly peculiar and compelling fact pattern that

motivated its use in *Chance, supra,* to this far more ordinary dispute.

First, causes of action brought at law are governed in the first instance by statutes of limitations that have been fixed by the Legislature to create defined and regularly applicable periods against which to determine timeliness. Laches, on the other hand, remains an equitable doctrine, utilized to achieve fairness. As such, as our footnote in *Lavin* made clear, in matters as to which no statute of limitations is directly applicable, courts first look to see whether there is an analogous statute that might appropriately fix the period of timeliness as to the equitable remedy. *Lavin, supra,* 90 *N.J.* at 153 n. 1, 447 *A.*2d 516. If there is, then that period can be applied to the equitable claim, unless there is an overriding reason why that application would be inequitable. To the extent that the trial and appellate courts understood the footnote to suggest that an action at law otherwise governed by a statute of limitations can be barred by application of laches, they were in error, because the footnote itself refers to the use of laches only in the context of an equitable claim. By our reference to a claim that might be governed by "an analogous statute of limitations" or one that is "similar" to a claim cognizable at law, *ibid.,* we made it clear that we were considering the laches defense only as it would apply to matters in equity.

Second, even were we to agree in principle that laches might be applied so as to shorten an otherwise permissible period for initiation of litigation, we would nonetheless conclude that only the rarest of circumstances and only overwhelming equitable concerns would allow for that result. *See, e.g., Chance, supra,* 405 *N.J.Super.* at 569, 966 *A.*2d 29. Although no party to the *Chance* dispute sought certification from this Court to review the Appellate Division's analysis of the circumstances in that matter, those circumstances were both unique and compelling. In *Chance,* the two law partners signed an agreement, the terms appeared to be unambiguous, one claimed that the other breached the agreement and stopped making payments otherwise due, and the partner who, if

he were not actually in breach would have been entitled to sue on the contract, did not do so for four years following the cessation of payments. *Id.* at 552–58, 966 *A.*2d 29. It was after his death that his heirs, still within the six years that would govern the suit had he himself filed it, sought to bind his former partner to the terms of the original agreement. *Id.* at 558–59, 966 *A.*2d 29. By that time, not only had the partner who had the claim but had not filed it died, but two other witnesses had died as well. *Id.* at 569, 966 *A.*2d 29. The significance of those deaths was that the surviving partner being sued on the contract was largely precluded from raising defenses that otherwise would have been available. *Id.* at 569–70, 966 *A.*2d 29. In those unique circumstances, the appellate panel concluded that laches might bar the heirs from asserting their claim. *Ibid.*

Whatever might be said about the use of laches in the peculiar setting that confronted the appellate court in *Chance,* that decision does not and cannot operate to extend laches broadly to cases governed by statutes of limitations. On the contrary, such an extension would replace the regular and predictable time limits fixed by our Legislature through the statutes of limitations with a system in which no lawyer or litigant could be confident of the time that would govern the initiation of litigation. Substituting the equitable doctrine of laches for the clear guidance expressed in statutes of limitations would create a chaotic and unpredictable patchwork in which the only certainty would be the inconsistency of outcomes as different judges or, as in this matter, juries, evaluated timeliness individually. We see no reason to conclude that our regular, predictable, and uniform system of fixing timeliness through application of the statutes of limitations should be replaced with such an approach.

Finally, the trial court applied the laches doctrine to the facts of this matter for what the court apparently believed was a pragmatic reason. The heart of the court's reasoning was that the delay on plaintiffs' part in filing the litigation had worked prejudice to defendants because they had continued to reap the benefits of the

customer list that they had gotten from Millman. In the court's view, plaintiffs essentially unfairly permitted defendants to exploit the marketing of that list, waited for the list to become more valuable than it was to begin with, then sought a recovery that would represent a windfall.

In using the equitable doctrine of laches to combat an increase in damages to which plaintiff would otherwise not be entitled, the trial court erred. Simply put, in seeking to quantify the damages to which plaintiffs would be entitled were they able to prove that defendants were liable to them based on the unauthorized use of the customer list, plaintiffs would not necessarily be entitled to the full amount of the sums that defendants were able to make in profits from the list. Rather, plaintiffs would only be entitled to recover as damages such sums as they could demonstrate were properly theirs, a determination that necessarily implicates an evaluation of whether "plaintiff ... fail[ed to act so as] to avoid the consequences of ... defendant's tortious conduct." *Lynch v. Scheininger,* 162 *N.J.* 209, 230, 744 *A.*2d 113 (2000) (defining doctrine of avoidable consequences as basis for diminution of damages or exclusion of elements of damages arising in context of tort or contract); *see Del Tufo v. Twp. of Old Bridge,* 147 *N.J.* 90, 119, 685 *A.*2d 1267 (1996) (concluding that doctrine of avoidable consequences survives enactment of Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3); *Ostrowski v. Azzara,* 111 *N.J.* 429, 437, 545 *A.*2d 148 (1988) (explaining that "plaintiff who has suffered an injury as the proximate result of a tort cannot recover for any portion of the harm that by the exercise of ordinary care he could have avoided"); *cf. State v. Ernst & Young, L.L.P.,* 386 *N.J.Super.* 600, 617, 902 *A.*2d 338 (App.Div.2006) (observing that "[i]t is well-settled that parties injured by a breach of contract have a common law obligation to take reasonable steps to mitigate their damages" (footnote and citation omitted)).

Having concluded that the trial and appellate courts erred in their application of the doctrine of laches to claims governed by the statute of limitations, we have reviewed the special interroga-

tories in an effort to determine whether the answers would permit a verdict to be molded in accordance with our decision. Our review of those answers and of the trial record convinces us that we cannot. Rather, because the matter, as submitted to the jury, was infused with the consideration of laches and the equities that doctrine presented, we can have no confidence in the responses of the jury to any of the interrogatories included on the verdict sheet. We are therefore constrained to reverse the judgment of the Appellate Division, to vacate the jury's verdict and to remand the matter for a new trial on plaintiffs' complaint.

B.

 Plaintiffs' petition raised three arguments in addition to the one challenging the application of laches to their cause of action. One of those points, suggesting that the trial court and the appellate panel erred in failing to utilize the continuing violation doctrine to assess timeliness, does not merit consideration in light of our rejection of the applicability of the doctrine of laches rather than the statute of limitations. The other two points raised in plaintiffs' petition, however, demand our brief attention.

Plaintiffs assert that the customer list that defendants secured from Millman was confidential as a matter of law, with the result that their motion for summary judgment on all issues should have been granted. We do not agree.

Plaintiffs argue that this Court has held previously that "customer lists of service businesses [are] afforded protection as trade secrets," and that "information need not rise to the level of a trade secret to be protected." *Lamorte Burns & Co., Inc. v. Walters*, 167 *N.J.* 285, 298–99, 770 *A.*2d 1158 (2001). By extension, they reason that because the information defendants received from Millman was protected and was, by its nature, confidential, defendants' receipt of it is actionable. We need not discuss the holding of *Lamorte* at length in order to make plain its relationship to the issues raised in this appeal. Although plaintiffs correctly note the essential holdings of *Lamorte*, it can only be understood by

recognizing that the individuals in that case who were being pursued on theories of tortious interference based on their taking of the customer lists were that plaintiff's employees. In that context, there could be no doubt that the employees were aware that the lists that they had taken were the property of their former employer. As this Court commented, "[t]he specific information provided to defendants by their employer, in the course of employment, and for the sole purpose of servicing plaintiff's customers, is legally protectable as confidential and proprietary information." *Id.* at 301, 770 *A.*2d 1158. The information gathered "went beyond the mere names of plaintiff's clients," and defendants "knew that [plaintiff] had an interest in protecting that information." *Ibid.* Given the scope of the employee-defendants' conduct, the Court found defendants liable for tortious interference and "other tort claims." *Id.* at 309, 770 *A.*2d 1158.

Thus, were plaintiffs in this appeal seeking relief against Millman, the *Lamorte* analysis would be significant. *See also Quinlan v. Curtiss–Wright Corp.,* 204 *N.J.* 239, 260, 8 *A.*3d 209 (2010) (observing that employees have a "common law duty to safeguard confidential information they have learned through their employment relationship[ ] and that they are generally precluded from sharing that information with unauthorized third parties"). Here, however, plaintiffs seek redress not from Millman, but instead from her subsequent employer. In the context of that claim, even though the customer list would be considered to be confidential, there remained a genuine issue of material fact concerning whether these defendants were aware that Millman's list was Target's proprietary information as opposed to a personal contact list that she had developed over the years.

Nor do we find a basis on which to impose on defendants, as plaintiffs request, an affirmative duty to undertake an inquiry, independent of the information given to them by Millman, as to the source of the customer list that Millman had. Cast as a challenge to the adequacy of the jury instruction on the issue of whether defendants acted in good faith, plaintiffs' contention is in

actuality a request that we recognize the existence of a new duty of inquiry.

In support of this request, plaintiffs point only to this Court's imposition of an independent duty to inquire into an independent contractor's essential competency upon a principal that engaged that independent contractor. *See Puckrein v. ATI Transport, Inc.,* 186 *N.J.* 563, 579–80, 897 *A.*2d 1034 (2006). Our consideration of this argument reveals no ground on which to impose a duty of independent inquiry upon an employer, like Polymer, faced with an otherwise unremarkable representation by a prospective employee, like Millman, that a list of contacts is her own.

We therefore conclude that neither of the additional questions presented in plaintiffs' petition for certification merits relief.

### III.

Defendants' cross-petition raised four questions, each of which we need only address briefly. Three of the questions presented raise arguments in the nature of defendants' entitlement to summary judgment, *see R.* 4:46–2, or involuntary dismissal, *see R.* 4:37–2. More particularly, defendants argue that portions of their motion for summary judgment that the trial court found lacking should have been granted. We disagree.

One of the motions was based on a claimed lack of adequate evidence of misappropriation of the customer lists and defendants' potential liability on the theory of tortious interference. As to that contention, there was adequate evidence in the record to support the trial court's denial of summary judgment and to require that the matter proceed to trial on this theory of law, *see Lamorte, supra,* 167 *N.J.* at 306, 770 *A.*2d 1158 (explaining elements of cause of action in context of business competitors); *Rycoline Prods., Inc. v. Walsh,* 334 *N.J.Super.* 62, 71, 756 *A.*2d 1047 (App.Div.) (identifying elements of cause of action sounding in misappropriation of trade secrets), *certif. denied,* 165 *N.J.* 678, 762 *A.*2d 659 (2000).

The other challenge to the denial of the motion for summary judgment is based on defendants' assertion that the Lanhams, as the principals of Polymer, should have been protected from exposure to personal liability. Although the argument before this Court is focused on the Lanhams' individual liability, it was not presented to the trial court in that manner. Rather, defendants raised a more general assertion that the evidence was insufficient. We therefore decline to consider whether there was adequate evidence that, if believed by the jury, would have been sufficient to support an award against the Lanhams individually. *See, e.g., Allen v. V. & A Bros., Inc.,* 208 *N.J.* 114, 130–35, 26 *A.*3d 430 (2011) (considering whether Consumer Fraud Act provides basis for individual liability arising from acts of corporation); *Saltiel v. G.S.I. Consultants, Inc.,* 170 *N.J.* 297, 303, 788 *A.*2d 268 (2002) (establishing participation theory as mechanism for extending liability from corporation to individual directors or officers). We do so without prejudice to further consideration of this question on remand.

We reject, however, defendants' argument that they were entitled to an order of involuntary dismissal of plaintiffs' claims at the close of plaintiffs' evidence. *See R.* 4:37–2. The involuntary dismissal rule requires the court to enter judgment in favor of defendant if, after the presentation of plaintiff's evidence, "upon the facts and upon the law the plaintiff has shown no right to relief." *R.* 4:37–2(b). In making that determination, the trial court is required to give all favorable inferences to the plaintiffs. *See Dolson v. Anastasia,* 55 *N.J.* 2, 5, 258 *A.*2d 706 (1969). Utilizing that indulgent standard, we concur with the trial court that because plaintiffs presented a sufficient quantum of evidence on each of the elements of the causes of action tried to the jury, involuntary dismissal was appropriately denied.

Finally, defendants' petition for certification raises arguments relating to their application for an award of attorneys' fees. That application was based on three alternate theories which defendants contended entitled them to an award of fees. That is, they

asserted that the litigation was frivolous, entitling them to an award pursuant to *N.J.S.A.* 2A:15–59.1(a)(1) and *R.* 1:4–8, that they were entitled to fees because plaintiffs raised a factual issue in bad faith at the summary judgment stage, *R.* 4:46–6, or that they were entitled an award based on the offer of judgment rule, *R.* 4:58–3(c)(1). Because our determination that the judgment entered in defendants' favor must be reversed in light of the impropriety of the application of the laches defense essentially moots these points raised in defendants' cross-petition for certification, we decline to address them.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded for a new trial.

*For reversal and remandment* Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—6.

*Opposed*—None.